[No. 839.]

## O. W. WARD, RESPONDENT, *v.* CARSON RIVER WOOD COMPANY AND D. R. HAWKINS, APPELLANTS.

ACTION OF TROVER—TITLE TO LAND, WHEN IMMATERIAL.—In an action of trover to recover the value of wood cut by defendants, under a contract with plaintiffs, upon land to which the plaintiffs claim possessory title: *Held*, that the defendants could not defeat a recovery by showing the title to be in the government of the United States, unless he connects himself with the government title.

TITLE TO PROPERTY—WHEN NOT AFFECTED BY DECLARATIONS OF THE ASSIGNEE OF A CONTRACT.—Where the terms of a contract for cutting wood required the parties of the first part to advance certain supplies and such moneys as they deemed "necessary to conduct the business to the best interests of both parties," and the contract was assigned by the parties of the first part to S. & Co., who refused to make any further advances, and said to the parties of the second part: "The wood is your wood to-

Statement of Facts.

day; it ain't my wood; it is your wood, and I can't go any further.  I want you to keep the wood, and I will buy it from you when it is put into Wolf Creek:" *Held*, that such declarations did not vest the title to the wood in controversy in the parties of the second part.

IDEM—ESTOPPEL.—*Held*, that the plaintiff was not estopped by such declarations from asserting his title to the property.

TAX TITLE—CERTIFICATE OF SALE,—WHEN SIGNATURE OF OFFICER MUST BE PROVEN.—It is essential to the validity of a certificate of sale, executed by an officer of another state, that it be shown that the person signing it is the officer authorized by the laws of that state to execute it, and that his signature thereto is genuine.

IDEM—SALE OF PROPERTY FOR TAXES.—Where property is sold for taxes in a summary manner, without any regular proceedings in a court of justice, it is essential that all the requirements of the law should be strictly complied with.

ACTION OF TROVER—WHEN DEMAND NOT NECESSARY.—When there has been an actual conversion of personal property, no demand is necessary, in order to sustain the action of trover.

IDEM—CONVERSION.—The taking of personal property under an invalid sale, with the intent to convert it to one's own use, amounts to a conversion, and the true owner of the property can recover its value in an action of trover, without making any demand, notwithstanding the fact that the purchaser purchased the property in good faith, believing his title to be valid.

IDEM—PLACE AND TIME OF CONVERSION—LIABILITY OF BAILEE.— A. was the owner of wood in Alpine county, California.  It was there wrongfully taken by B. and C., claiming it as their own.  It was delivered in the Carson river to D., as a bailee for B. and C., and transported to Empire City, Nevada, at the expense of B. and C., and was there sold to E., where a demand for the wood was made by A. of the bailee, and refused.  *Held*, that the conversion took place in Alpine county, California; that the refusal of the bailee to deliver the wood when demanded, did not amount to a new conversion; that by the refusal, the bailee became liable to the same extent that B. and C. and E. were liable, and no more, and that they were only liable for the value of the wood at the place of conversion.

IDEM—MEASURE OF DAMAGES.—There being nothing in this case calling for special or exemplary damages; *Held*, that the plaintiff was entitled to recover the value of the wood at the time of the conversion, with legal interest from that date up to judgment.

APPEAL from the District Court of the Second Judicial District, Ormsby county.

The facts are stated in the opinion of the court.

Petitions for a rehearing were filed by both parties and refused.

The answer to the petition of respondents for a rehearing, contained a corrected statement of facts. The answer to appellant's petition, was only with reference to the question of estoppel. The opinion as published, contains the substance of the opinion of the court on rehearing.

*Robert M. Clarke,* for Appellant.

I. The action being trover, the measure of damages should be the price of the wood in Alpine county, where the conversion, if any, took place. (8 Nev. 345; 2 Nev. 123; 33 Cal. 117; 19 Maine 361; 34 Cal. 641; 3 Sandford 614.) By suing in trover, the plaintiff waived the tort, and abandoned his right to the property. He consented to treat defendant as the owner of the wood. His cause of action arose, if at all, when the taking occurred; his rights, if any, then commenced; and no correct rule will permit those rights to be enlarged or made more valuable by reason of labor performed or money invested by defendant after they accrued, and after the cause of action arose, especially in a case like this, where the defendant is shown to have acted in good faith.

II. The court erred in excluding the evidence of the tax title. (Sec. 3794 Pol. Code of Cal.; Cooley on Taxation, p. 195.)

III. The court erred in denying defendant's instructions, to the effect that boundaries of timber land of the United States, must be plainly and distinctly marked before a possessory title to them can be acquired, and that no such title can be acquired to timber land under the laws of California.

IV. If, as the defendant maintained, and as the proof clearly warranted, the plaintiff and grantors were to furnish supplies sufficient to enable defendants' grantors to deliver the wood into Wolf Creek, and if, as alleged, and as the proof clearly warrants, the plaintiff's grantor refused to furnish such supplies, and gave up his rights under the contract and all claim to the wood, and told the defendants' grantor that the wood was his, and that he should take it and do what he pleased with it; and thereafter neither plaintiff nor his grantor did or would perform said contract,

on their part, and never had or received the wood at Wolf Creek, or elsewhere, and the defendants' grantor, acting upon such abandonment, took the wood and sold it to the defendant, and the defendant, in good faith, paid for the wood, and transported it from Alpine county, in the state of California, to Empire City, in the state of Nevada—in that case, whatever may have been originally the rights of plaintiff's grantor, they were fully relinquished and canceled, and the defendants' rights, as against the plaintiff, were complete.

The vendors of appellant Hawkins were induced to expend large sums of money, upon the faith of the declarations made by Stadtmuller in the purchase and removal of the wood, and as Stadtmuller was, at the time of making such declarations, the absolute owner of the contracts, the plaintiff is estopped by such declarations from now claiming the wood, or denying the title of appellant Hawkins.    (24 Vt. 270; *Rowley* v. *Bigelow*, 12 Pick. 307, 315; *Salem Bank* v. *Gloucester B.*, 17 Mass. 1; Parsons on Con., vol. ii, 340-9; *Copeland* v. *Copeland*, 28 Me. 525; *Preston* v. *Mann*, 25 Conn. 128; Story on Agencies, sec. 91; *Gosling* v. *Birnie*, 7 Bing. 339; *Heane* v. *Rodgers*, 9 B. & C., 577, 578; *Clark* v. *Clark*, 6 Esp. R. 61; *Like* v. *Howe*, Id. 20; 4 Munroe, 50; 5 B. & C. 153; 7 Can. & P. 501; 6 Ad. & El. 479; 8 Wend. 483; Peake's Cas. 203; *Dezell* v. *Odell*, 3 Hill, 222; *Thompson* v. *Blanchard*, 4 Coms. 303; *Hill* v. *Epley*, 31 Pa. St. 331; *Newman* v. *Edwards*, 34 Id. 32; *Hackett* v. *Callender*, 32 Vt. 97; U. S. Digest, vol. iv., sec 828; 12 Pick. 307, 315; *Boggs* v. *Merced Co.*, 14 Cal. 368; *Henshaw* v. *Bissell*, 18 Wall. 271; 27 Mich. 435; *Gregg* v. *Wells*, 10 Ad. & El. 90; *Cornish* v. *Abington*, 4 H. & N. 549; *Woodley* v. *Coventry*, 2 H. & C. 164; *Buchanan* v. *Moore*, 13 S. & R. 304; 30 N. Y. 226; 6 John Ch. 166; 47 N. Y. 493; *Freeman* v. *Cook*, 2 Ex. 654; 8 Wend. 480; 8 Barb. 102; 8 E. C. Green (N. J.) 84; 3 Hill. 215; 9 Allen, 455; 11 Id. 340; 14 Cal. 368; 18 Wall. 271.)

*Ellis & King*, for Respondents.

I.    The contract was not abandoned by Ward through Stadtmuller.    Stadtmuller & Co. were mere mortgagees;

they could not, by mere empty declaration, vest title to this property in Dixon or Bertrand so that they could make a good and sufficient title to third parties. There was no consideration passed to Stadtmuller; there was no delivery of possession.

II. The corporation defendant actually converted the wood to its own use. The terms of its refusal to deliver it upon demand, amounts to a conversion of the wood. A demand and refusal is equivalent to, or rather is, conclusive evidence of a conversion. (*Whitman G. & S. M. Co.* v. *Trille*, 4 Nev. 503.) The question always is, does the defendant exercise dominion over the property in question in defiance of plaintiff's right? If it does, that, in law, is a conversion, whether it be for his own or another person's use, as in this case. (5 Cowen, 325; 1 Chitty Pl. 157; 1 Dev. N. C. 308; also cases in 4 Nev. 502.) If the plaintiff had seen proper to bring his action of replevin on the eleventh of September, 1876, he could have got possession of the property itself, or in lieu thereof, the value of that property at that time and place. The action of trover which was brought, is precisely the same in legal effect as the action of replevin. The mere form of action cannot change the substantial rule of damages or compensation. The plaintiff having the right of dominion and right of possession over this property, anywhere in the world, he has the right to elect the point at which he will undertake to acquire possession of his own. (*Hisler* v. *Carr*, 34 Cal. 644; 2 N. Y. 295; *Sillsbury* v. *McCoon*, 3 Coms. 381; 4 Nev. 494; 7 Cowen, 94; 6 Johns. 168; 8 Wend. 508; 5 Johns. 348.) The defendant corporation—the real party who is guilty of conversion in this case—never had possession of the property until it was delivered in the Carson river. The question here is not one of fluctuating values, but it is as to when the conversion took place, whether or not it was not a distinctive conversion at Empire City on the eleventh of September, at the time the demand was made. It appears that the property was at that time, and in that manner, converted by the defendant, and by that distinct act of conversion this action has been brought, and has been fully sustained by all the proof. To permit the defendant to escape with

the value of the wood at a certain time, on the ranch, would be tantamount to permitting him to take advantage of his own wrong. If this property had been transported to any other State in the Union, and plaintiff had followed it up, and made his demand, defendant would have been under obligations to surrender the possession at the time and place where the demand was made, and the value of the property at that time and place in that jurisdiction, would be the measure of damages.

III. The defendants claim that they came into possession of this property under color of law. In such a case, before the action of trover can be maintained, it is essential to make demand, and until such demand is made, and a refusal by the defendants to deliver, there is no conversion for which trover can be maintained. (Addison on Torts, 454, also 398–9; 2 N. Y. 295.)

IV. The defendant's alleged tax title is utterly worthless. He totally failed to show a compliance with the statute of California on that subject.

V. Hawkins cannot destroy his liability to pay the value of the wood at Empire by proving that some other tort feasors —his pretended predecessors in interest—had, at another time and place, converted the same property, and thus, by a wrongful deraignment of a spurious title by relation, be carried back to a so-called conversion committed by some stranger to the record. He cannot plead in extenuation the wrongful acts of his predecessors, any more than he can be held responsible for those acts with which he was in no wise connected. (3 N. Y. 381, 390, and cases cited; Sedgwick on Dam. 484.)

By the Court, Hawley, C. J.:

This is an action of trover, brought against the Carson River wood company, a corporation, to recover the value of one thousand eight hundred and sixty-two cords of merchantable pine cord-wood, which plaintiff alleges was wrongfully converted by said defendant on the eleventh day of September, A. D. 1876, at Empire City, in Ormsby county, Nevada.

The answer of the Carson River wood company, after denying the plaintiff's ownership of the wood, alleges that one D. R. Hawkins was, prior to the commencement of this suit, and is now, the owner of said cord-wood; that on the nineteenth day of July, 1876, at Alpine county, California, said D. R. Hawkins and one S. W. Griffith, then being the owners of the wood, delivered the same into the possession of the Carson River wood company, as their agent and bailee, to be by it driven and transported down the Carson river to Empire City; that said wood was so driven and transported by said company, and is now held by it as the agent and bailee of the said D. R. Hawkins, and not otherwise.

D. R. Hawkins subsequently intervened and filed an answer, as a defendant in said cause, denying plaintiff's ownership of said wood, and asserting ownership and possession in himself.

The cause was tried before a jury, and resulted in a judgment against the defendants for thirteen thousand and thirty-four dollars, and costs.

The defendants moved the court for a new trial, which was refused. From this judgment and order defendants appeal. From the record it appears that one Sol Simpson, as a party of the first part, on the fifteenth day of May, A. D. 1875, entered into a written contract with one Sam Dixon, as a party of the second part, the terms of which are as follows: "The party of the second part agrees to cut, split, bank, and run into the main stream of what is known as Wolf creek, in Alpine county, California, three thousand cords of good, merchantable wood; said wood to be cut on what is known as the Simpson & Ward ranch, on said Wolf creek; * * * to pile the wood four feet and two inches high, * * * and have the same completed on or before the first day of June, A. D. 1876. The party of the first part agrees to pay the party of the second part three dollars and fifty cents per cord for each and every cord delivered as aforesaid in payment, as follows: To furnish the said second party with tools, provisions, and team necessary for use in cutting said wood; also with what money the party of the

first part may deem necessary to conduct the business to the best interest of both parties. It is further agreed that no money shall be paid until after. September 1, 1875, and the balance due after the completion of this contract to be paid thirty days after all the wood is out of the river at Empire City, Nevada."

On the first day of December, A. D. 1875, a similar contract was made between Sol Simpson and O. W. Ward, parties of the first part, and Louis Bertrand, of the second part, for cutting, splitting, banking and fluming into Wolf creek one thousand cords of wood, more or less, the contract to be completed on or before the first day of May, A. D. 1876; the price per cord to be three dollars and twenty-five cents. In this contract the parties of the first part "further agree to pay the party of the second part, fifty cents per cord for fluming two hundred cords of wood left out of wood cut by St. John and Mayo, and owned by the said first parties." * * * "The parties of the first part further agree to pay said second party for fluming the above mentioned two hundred cords of wood as soon as the work is completed, and to pay five hundred dollars on cutting after the wood is measured."

Prior to, and at the time of the making of these contracts, Sol Simpson and the respondent Ward, claimed the land upon which the wood was cut, and upon the trial much testimony was offered tending to show that they had a good possessory title to the timber land known as the Simpson and Ward ranch, and that they had purchased the land known as the St. John ranch, from St. John, who claimed to have the possessory title thereto.

The contract made with Bertrand did not specify upon what land the wood was to be cut, but nearly all of it was cut on what is known as the St. John ranch. Of the wood in controversy in this suit, one thousand and seventy-nine cords were cut under the contract, by Dixon, on the Simpson and Ward ranch; two hundred and eleven cords belonged to Simpson and Ward under their purchase from St. John; the balance was cut, under the contract, by Bertrand.

On the thirtieth of March, A. D. 1876, upon settlement of

accounts with Dixon, it was ascertained that five thousand three hundred and sixteen dollars and eighty cents had been advanced to him in money, provisions and supplies. The amount of the wood that had been cut by Dixon was two thousand two hundred and seven cords. Of that amount, three hundred and eighty-nine cords had been delivered to Sol. Simpson. After deducting the contract price of the three hundred and eighty-nine cords, and the sum of five hundred and fourteen dollars and fifty cents, for labor, there remained a balance of three thousand three hundred and forty dollars and eighty cents, more than sufficient to pay for the value of the one thousand and seventy-nine cords at the ranch where cut, and nearly enough to pay the contract price at the point of delivery. The amount advanced by Simpson & Ward to Bertrand was one thousand and eighteen dollars and twenty-three cents, being over two thirds of the value of the wood cut by him. At the time of this accounting the contracts were, by Simpson & and Ward, assigned to Stadtmuller & Co., of Empire city. The assignments were made "for value received," and thereafter, on the ninth day of September, 1876, Stadtmuller & Co., "for a valuable consideration," sold and transferred to O. W. Ward, respondent, all their right, title and interest in and to the wood in controversy. At the time of the assignments of the contracts to Stadtmuller & Co., Ward informed Dixon and Bertrand that Stadtmuller & Co. would run the business with them, and it appears that Stadtmuller & Co. (for Ward) then advanced, in money and supplies, the sum of one hundred and ten dollars. Whether the assignments to Stadtmuller & Co. were made as security for any advances they might make to Dixon and Bertrand, does not definitely appear from the record; but the facts that do appear, warrant the conclusion, claimed by respondent's counsel, that it was not an absolute sale. Ward testified that he owned the contracts between the thirtieth of March, 1876, and the tenth of September, 1876, although they had been assigned to Stadtmuller & Co. This testimony is not denied; but it does not, perhaps, very clearly appear that Dixon or Bertrand had any notice that

Ward was the real owner, and therefore in determining the effect of any declaration made by any of the firm of Stadtmuller & Co., it will, by us, be assumed that they were the real owners of the contracts and of the wood in controversy at the time the declarations were made.

About three weeks after the assignments were made, Dixon and Bertrand applied to Stadtmuller & Co. for more supplies. Stadtmuller informed them that he had ascertained that the matters were not as they had been represented, and for that reason he would not have anything more to do with the business. He refused to make any further advances, and said to Dixon and Bertrand: "The wood is your wood to-day; it ain't my wood, it is your wood, and I can't go any further. I want you to keep the wood, and I will buy it from you when it is put into Wolf creek or in the main river." After this conversation, Dixon applied to Ward for supplies, and was told that he had better go up the river and wait. Ward said: "I don't want to give you any money; if I do, I will have to raise it on my house;" and added: "You had better go and see Stadtmuller." No supplies were furnished after this conversation; no more wood was cut, and no attempt was made by Dixon or Bertrand to get the wood into Wolf creek, or into the Carson river, except by repeated efforts to obtain further supplies, which, they claim, was necessary for them to have to enable them to comply with their contracts. Failing to get any further supplies, Dixon, after consulting with S. W. Griffith, county judge of Alpine county, on the fourth of May, 1876, sold and delivered the wood then on the Simpson & Ward ranch, to L. M. Buel, county clerk of Alpine county. Buel afterwards sold the same to D. R. Hawkins. Bertrand, at the same time, sold and delivered the wood on the St. John ranch, to S. W. Griffith. Griffith afterwards sold it to A. M. White, and White, at Griffith's suggestion, afterwards conveyed the same to Hawkins. A portion of the wood cut under the Dixon contract was removed from the Ward & Simpson ranch by Buel, before he sold the wood to Hawkins, and a portion of it was removed by Hawkins after he purchased it from Buel.

Hawkins claimed to own all this wood at the time it was delivered to the Carson river wood company. The wood cut under the Bertrand contract was removed from the St. John ranch by Griffith, and was not conveyed to Hawkins until after it arrived at Empire city. The expenses for fluming the wood down Wolf creek were paid, or agreed to be paid, in the first instance, by the respective parties, Buel, Hawkins and Griffith. But Hawkins, in purchasing the wood, assumed all the expenses incurred by its transportation.

1. It is first claimed by appellants that the court erred in denying certain instructions, asked by them, to the effect that the boundaries of timber lands in the United States must be plainly and distinctly marked before a possessory title thereto can be acquired, and that no such title can be acquired under the possessory laws of California.

In determining this question, it must be remembered that the title to the land is not in controversy in this action. The question whether plaintiff had the possessory title is, in our opinion, immaterial. The fact is undisputed that Simpson & Ward claimed to have the possessory title; that Dixon and Bertrand entered into the contracts agreeing to cut the wood for them, and that the wood was cut upon said lands under these contracts. We are of opinion that appellants could not defeat a recovery of the wood, by plaintiff, by showing the title to the land to be in the government of the United States, unless they in some manner connected themselves with the government title. (*Weymouth* v. *Chicago and Northwestern Railway Company*, 17 Wis. 550; *Hungerford* v. *Redford*, 29 Wis. 346; *King* v. *Orser*, 4 Duer, 431; *Carter* v. *Bennet*, 4 Fla. 355; *Cook* v. *Patterson*, 35 Ala. 102.)

2. Did the declaration of Stadtmuller, as argued by appellant's counsel, vest the title to the wood in controversy, in Dixon and Bertrand?

There is nothing in either of the contracts to the effect that if Simpson, in the one, or Simpson & Ward in the other, failed to comply with the terms of the contract, the wood cut thereunder should belong to Dixon or Bertrand;

nor is there any agreement that either Dixon or Bertrand should have any lien upon the wood to secure the contract price. The testimony fails to establish an abandonment of the contracts upon the part of Simpson & Ward. More money, provisions and supplies had been furnished by them than the contracts called for. By the express terms of the contract, they were not to pay for the wood until it was out of the river at Empire. They were only required to advance such amounts of money as they deemed "necessary to conduct the business to the best interests of both parties," and there is no positive proof that they did not, prior to the assignments, furnish all the supplies that were necessary to enable Dixon and Bertrand to fully complete the contracts. But even if we should admit, for the sake of the argument, that the declarations of Stadtmuller amounted to an abandonment, it does not necessarily follow that the effect of the abandonment was to vest the title of the wood previously cut under the contracts, in Dixon and Bertrand. How could the unexplained and singular declaration, and expression of opinion, of Stadtmuller, vest the title in the men who cut the wood? There was nothing said by him that amounted to a sale; nothing that amounted to a gift; no delivery or transfer of possession; nothing but the mere gratuitous expression of an opinion that the wood was theirs, and that he would buy it from them when they put it into Wolf creek or into the Carson river. Whatever might be the effect of this statement in an action to recover damages for a breach of the contracts, it seems to us very clear that it did not, under the proofs in this case, vest the title to the wood in Dixon and Bertrand. It therefore, necessarily follows that the sale by Dixon and Bertrand conveyed no title to the purchasers. It is contended by appellant that inasmuch as Hawkins and his predecessors in interest, relied upon the declarations of Stadtmuller that the wood belonged to Dixon and Bertrand, and were thereby induced to purchase the wood, paying full value therefor, and expending large sums of money thereon; that Stadtmuller and his assignee are estopped from asserting any title to the wood.

It is evident that the facts relied upon—if they had been properly pleaded—are wholly insufficient to constitute an equitable estoppel *in pais.*

The declarations of Stadtmuller were not made to either Buel, Griffith or Hawkins, and they cannot claim that they were induced thereby to expend any money on the faith thereof. If they had applied to Stadtmuller to ascertain the facts in regard to the title to the wood, and Stadtmuller had informed them that he had no claim upon the wood, and that the title thereto was in Dixon and Bertrand, then some of the numerous authorities cited by appellant's counsel would have been applicable. But the proofs are that the declarations were made to Dixon and Bertrand, who knew all the facts just as well as Stadtmuller. They knew that the legal title was in Stadtmuller; that his remarks were made without consideration, and did not amount to either a gift or sale of the wood to them, and did not authorize them to sell or convey the same to any one. (*Cummings* v. *Webster*, 43 Me. 192; *Lewis* v. *Castleman*, 27 Tex. 408.)

3. The appellant Hawkins also claims the wood by virtue of certain tax titles.

Upon the trial, the court excluded the certificates of sale, and it was argued that this action of the court was erroneous. It appears from the recitals in the assessor's certificate of sale of the wood on the Simpson & Ward ranch, that the assessor, on the twenty-sixth day of May, 1876, duly listed and assessed to L. M. Buel, S. Dixon, F. D. Stadtmuller, S. Simpson and O. W. Ward, two thousand cords of wood, at two dollars and fifty cents per cord, and ten thousand feet of lumber, at fifteen dollars per thousand; that the assessor, on the said twenty-sixth day of May, advertised the property for sale, by posting written notices, signed by him, in three public places in Alpine county; that on the third day of June, 1876, the assessor offered at public auction "so much of said property as would be sufficient to raise said sum of money so due for said taxes;" that "D. R. Hawkins bid the smallest or least quantity of said personal property and pay said taxes and costs, to wit: one hundred and fifty-one dollars and ninety-two cents taxes and one dollar and fifty-one

cents costs; that the smallest quantity bid or offered to be taken by said D. R. Hawkins, and pay said taxes and costs, was the whole of said cord-wood; that the whole of said cord-wood was by" the assessor "then and there struck off and sold to said D. R. Hawkins, he being the best bidder therefor."

Similar recitations appear in the certificate of sale from the assessor to S. W. Griffith, for eight hundred and fifty cords of wood and five thousand one hundred and eighty feet of lumber, on the St. John ranch, assessed to L. Bertrand, S. Simpson, O. W. Ward and F. Stadtmuller. The certificates were signed "A. M. Grover, assessor of Alpine county; Henry H. Merrill, deputy."

Appellants offered testimony to prove that Grover was assessor, but failed to make any proof whatever that Merrill was his deputy, or that the signature to the certificate of sale was the signature of the officer making it. These facts were essential, in order to give validity to the certificates. (Blackwell on Tax Titles, 92, 217; *Rockbold* v. *Barnes*, 3 Rand, 473.)

In California, it has been held that the supreme court should take judicial notice of the fact as to who fills the various county offices within their jurisdiction, and of the genuineness of their signatures. (*Wetherbee* v. *Dunn*, 32 Cal. 106.) But our attention has not been called to any authority, and we apprehend none can be found that requires the courts of one state to take judicial notice of the various county officers of another state, or the genuineness of their signatures. This objection was of itself sufficient to justify the ruling of the court in excluding the certificates of sale. Other objections were made by respondent, which, in our opinion, were equally well founded.

The law of California relating to the collection of taxes by the assessor on personal property, and authorizing a seizure and sale, where the owner has no real estate, provides, among other things, that "the sale must be at public auction, and of a sufficient amount of the property to pay the taxes, percentage and costs." (2 Cal. Political Code, 3791.) "3792. The sale must be made after one week's notice of

the time and place thereof, given by publication in a newspaper in the county, or by posting it in three public places."
"3794. On payment of the price bid for any property sold, the delivery thereof, with a bill of sale, vests the title in the purchaser."

Appellants failed to prove that these provisions of law were complied with. The property was not sold at "public auction," in the manner required by section 3791. There is no satisfactory proof that it was necessary to sell the entire quantity of wood in order to pay the taxes, and we are of opinion that the wood ought to have been offered for sale by the cord, and only so much sold as was sufficient to pay the taxes, percentage and costs. (Cooley on Taxation, 344; Blackwell on Tax Titles, 286–289, and authorities there cited.)

Appellants' counsel, having attempted, but failed, to prove that the notices of sale were posted in three public places, as required by section 3792, contend that the certificates of sale were conclusive evidence of the facts therein recited. This position is wholly untenable.

There are no provisions in the law of California—at least none that were offered in evidence—which makes the bill of sale of personal property even *prima facie* evidence of the facts recited in it. The law does not specify—as it does in regard to certificates of sale given by the officer upon the sale of real property—what shall be stated in the bill of sale. Section 3786 relates exclusively to sales of real estate. It is not made applicable to sales of personal property made by the assessor. (See sec. 3822.)

The law does not require the assessor, in selling personal property, to give a certificate of sale, but simply provides that upon the payment of the purchase-money he must deliver the property, "with a bill of sale."

It is evident that if the court had permitted the certificates of sale to be introduced in evidence, the jury would have been compelled, under proper instructions, to disregard them, because the testimony, in several particulars, failed to show the essential facts required by law to give them any validity.

It is unnecessary to notice the various other objections made by respondent's counsel to the certificates of sale.   It is sufficient to state, in general terms, that the fact that the property was levied upon and advertised for sale without any effort having been made by the assessor to notify the owners of the property, and that property assessed at over five thousand dollars was sold for one hundred and fifty dollars, shows the necessity of courts enforcing a strict compliance of the law.   In cases like this, where the sales were made *ex parte,* without any regular proceedings in a court of justice, it is essential that each and every of the requirements of the law should be strictly observed by the officer exercising this summary power.   The bare possibility that the power might be abused by the officer, and that injustice might be done to the owner, ought to require from the courts a strict construction of, and a literal compliance with, the law.

4. This brings us to the most important question involved in this case, viz: did the court err in giving the fifth instruction asked by respondent's counsel?   It reads as follows: "If the jury find from the evidence that the wood in controversy was put into the wood-drive of the said defendant, the Carson river wood company, at Alpine county, state of California, by some person or persons having the custody or possession thereof, not the owner or owners thereof, the possession of such Carson river wood company of said wood was lawful until demand made by the owner or owners, and it was not until after demand was made on them by the owner or owners, and refusal to deliver it up, that any conversion took place, and an action for the recovery of the property, or for damages for its conversion, would lie by the owner; and the owner of the property is entitled to recover the value of the property converted at the time and place of such conversion."

The wood, at the time of the demand upon, and refusal by, the Carson river wood company, was out of the river and corded up at Empire city, in Ormsby county, in this state, and was then and there worth the sum of seven dollars per cord (the value found by the jury).   The Carson river

wood company did not claim the wood as its property; but when the written demand was made upon it to deliver the possession to Ward, it refused, upon the ground "that the wood thereby claimed by O. W. Ward is also claimed by other persons or parties." The proofs show that the corporation was a mere bailee for the defendant Hawkins and others, and had no further interest in the wood except to secure its pay for services in driving and transporting the wood to Empire city. Its refusal to deliver the wood under such circumstances did not amount to a new conversion. Its liability was not fixed or determined by the time or place it came into possession of the property. It might have relieved itself from all liability to the plaintiff by delivering him the wood when it was demanded. By its act of refusal to deliver the wood when demanded it became liable to the plaintiff to the same extent that the defendant Hawkins, and his predecessors in interest, were liable, and no more. Hawkins, Griffith or Buel could only have been held liable (there being nothing in the case to warrant special or exemplary damages) for the value of the wood at the time and place of its conversion, with legal interest, from that date up to the time of judgment.

During the progress of the trial the defendants, having in their original answers admitted the value of the wood at Empire city to be five dollars and seventy-five cents per cord, were, on motion, allowed to amend their answers by alleging that the value of the wood, on the respective ranches where it was cut, was two dollars per cord, and no more. The testimony as to its value at that point varies from two dollars to three dollars per cord.

The proofs show that Hawkins, and his predecessors in interest, took possession of the wood upon said ranches, and at their own expense caused it to be removed therefrom and flumed down Wolf creek into the Carson river, claiming it as their own. The expenses so incurred by them, added to the amounts paid for the purchase of the wood, exceeded six thousand dollars. This does not include the amount of one dollar and fifty cents per cord due the Carson river wood company for driving and trans-

porting the wood down the Carson river to Empire.   It is
proper to state, in this connection, that the plaintiff, upon
the cross-examination of Hawkins and other witnesses,
sought to prove that there was a collusive agreement be-
tween Hawkins and the persons from whom he purchased
the wood that the purchase-money, as evidenced by certain
promissory notes, was not to be paid unless he finally re-
covered in this action.   Nevertheless, the fact remains
undisputed that the entire cost of removing the wood
from the ranches in Alpine county, California, where it
was cut, was either paid or incurred by the defendant
Hawkins, and that its enhanced value was solely caused
by the acts of Hawkins, and his predecessors in interest,
in having it so removed, flumed, driven and transported to
market at Empire city, Nevada.   The plaintiff knew that
the wood had been sold by Dixon and Bertrand, and that it
was claimed by other parties, but took no steps to advise
the purchasers of his title until the wood arrived at Empire.
In his testimony on cross-examination he said: "I knew or
heard when the drive was going to leave up there.   I didn't
go and look after the wood, because I heard it had been
sold and that fighting men had been put in the camp to kill
me if I came up."   There is no pretense that Ward or Stadt-
muller claimed any title to the wood or attempted, in any
manner, to assert any dominion or control of it after the
sale by Dixon and Bertrand until it arrived at Empire.   The
argument of respondent's counsel in support of the instruc-
tions given by the court, and of the measure of damages
found by the jury, is based upon the theory that a demand
was necessary, and that the demand and refusal, as proven
in this case, fixed the date of the conversion of the property.
This principle is often applied in actions against brokers to
recover the value of mining stocks, etc., and a demand and
refusal are sometimes proven in other cases for the purpose
of showing the defendant's possession to be wrongful.   But
the proof of the demand and refusal is only one of the means
that may be resorted to for the purpose of establishing the
fact of a conversion.   When there has been an actual con-
version, no demand is necessary in order to sustain the

action of trover. (*Carr* v. *Hemenway*, Davies, 328; *Earle* v. *Van Buren*, 2 Halsted, 344; *Davison* v. *Donadi*, 2 E. D. Smith, 121; *State* v. *Patten*, 49 Me. 383; *Hardy* v. *Keeler*, 56 Ills. 152.) The same rule prevails in actions of replevin. (*Perkins* v. *Barnes*, 3 Nev. 557.)

The taking of the wood by Hawkins and others, under the unauthorized sales, with the intent to convert it to their own use, amounted to a conversion, and the true owner of the wood could recover its value in an action of trover, without making any demand, notwithstanding the fact that they purchased the property in good faith, believing the title to be valid. (*Whitman G. & S. M. Co.* v. *Tritle*, 4 Nev. 494.)

The wood, as it was piled upon the ranches in Alpine county, belonged to the plaintiff and his predecessors in interest. It was there wrongfully converted by the defendant Hawkins and his predecessors in interest. That was the place where the plaintiff's property was taken from him. After this conversion, the defendant Hawkins and his grantor, Griffith (claiming the wood as their own), delivered it in the Carson river to the defendant, the Carson river wood company, as their bailee. The Carson river wood company, as a bailee for Hawkins and Griffith, transported the wood down the Carson river to Empire city, where the plaintiff made the demand for the wood. The plaintiff is entitled to recover full compensation for the value of the property taken; but he is not entitled to recover the value as increased by the labor and expenditure of money upon the part of the defendant Hawkins or any of his predecessors in interest. This would certainly be giving him complete indemnity for the loss he sustained, which is the real object of the action of trover. (*Boylan* v. *Huguet*, 8 Nev. 358, as well as in replevin, where the property cannot be returned; *Buckley* v. *Buckley*, 12 Nev. 424, and authorities there cited.) There is nothing in this case, calling for any special or exemplary damages, and hence the true measure of damages which the plaintiff was entitled to recover, was the value of the wood at the time of the conversion, with legal interest from that date up to judgment.

(*Boylan* v. *Huguet, supra; Weymouth* v. *Chicago and North-western Railway Company,* 17 Wis. 554; *Moody* v. *Whitney,* 38 Me. 174; *Bourne* v. *Ashley,* 1 Lowell, 27; *Winchester* v. *Craig,* 33 Mich. 207.)  There may be cases imagined that might require a modification of this rule, in order to reach the controlling principle of compensation; for it has been often said that the rule always yields, when the facts require it, to the principle upon which the rule is founded.  But "sufficient unto the day is the evil thereof," and it will be time enough to decide such cases when they are presented.  It is enough for us here to say that, in our judgment, there are no facts in this case that call for any modification of the rule.  The rule adopted, if properly applied, does give the plaintiff full compensation.

In the case cited from Wisconsin, the plaintiff had caused wood to be cut, and had piled it on the premises of the defendant, in the town of Farmington, in Jefferson county, with a view of selling it to the defendant.  At that place the wood was worth about one dollar and fifty cents per cord.  Before the contract was completed, the defendant, by mistake, carried the wood to Janesville, and there mingled it in such a manner that its identity was lost.  The plaintiff then demanded it at Janesville, and the defendant did not deliver it.  Wood at that time was worth four dollars per cord in Janesville, and was afterwards worth five dollars.  The plaintiff brought an action of trover to recover the value of the wood, and the question was whether the plaintiff should recover its value at Janesville, or only the value at Farmington, where it was first taken.  Paine, J., on delivering the opinion of the court, after admitting that a wrong-doer cannot, by bestowing labor upon the property of another, which he has tortiously taken, divest the title of the original owner, and that the owner may retake it in whatever form it may be found, so long as its identity can be established, said: "But where the owner voluntarily waives the right to reclaim the property itself, and sues for the damages, the difficulty of separating the enhanced value from the original value, no longer exists.  It is then entirely practicable to give the owner the entire

value that was taken from him, which certainly seems to be all that natural justice requires, without adding to it such value as the property may have afterwards acquired from the labor of the defendant. In the case of recaption, the law does not allow it, because it is absolute justice that the original owner should have the additional value, but because the wrong-doer has, by his own act, created a state of facts where either he or the owner must lose something. There the law says the wrong-doer shall lose. But if the owner chooses to resort to another remedy, in applying which the law may give him full compensation for all that he has lost, without compelling the wrong-doer to pay more, I see no reason why that should not be the rule. The value of the property at the moment of the conversion, without such increase as it may have received from fluctuations of the market, or other causes independent of the acts of the defendant, should be the measure of the damages."

We are of opinion that the authorities cited by respondents' counsel, which hold that the measure of damages should include the enhanced value of the property, merely because the owner might, in an action of replevin, have recovered it in specie, are not supported by sound reason nor sustained by the weight of the decided cases; and hence they ought not to be followed by this court.

The judgment of the district court is reversed, and the cause remanded for a new trial, unless the respondent elects, within ten days after the filing of the remittitur herein in the district court, to have the judgment modified so as to include only the value of the one thousand eight hundred and sixty-two cords of wood, at two dollars per cord, with legal interest on such value from the time of the conversion of the wood from the ranches in Alpine county, California (said judgment to be for gold coin of the United States), in which event the judgment, as thus modified, will be affirmed. Appellants are entitled to recover their costs on appeal.