Ross *v.* Scott and Russell.

15L 479
2pi 2

GEOGRE W. ROSS *v.* JOHN G. SCOTT and A. B. RUSSELL.

1. CHANCERY PLEADINGS AND PRACTICE. *Mesne profits. Rents.* A bill filed to recover the possession of land, and remove a cloud from the title of the complainant by reason of the claim of the opposing party, and, as incident to the relief sought, an account for mesne profits, mining coal and cutting timber, is a bill of pure equitable cognizance under our decisions, and all that the complainant can claim on the account is reasonable rent and just compensation for the coal mined and wood cut.

2. PLEADINGS AND PRACTICE. *Action for damages.* The courts of law, trammeled by their forms of action and the principles on which they were supposed to rest, such as title in replevin and conversion in trover, have found it difficult to adopt a rule which would lead to uniformity in the recovery of damages for the same wrong, but show a growing inclination to apply the only safe and just rule in actions for damages, whether *ex contractu* or *ex delicto*, and that is to give just compensation for the injury, which has always been the rule of equity.

Ross *v.* Scott and Russell.

3. SAME. *Damages.* The weight of authority now is, that where there is an honest dispute as to title, or where the trespass has been from ignorance, and not wilful, the damages will be confined to the value of the property before the trespass was committed.

4. SAME. *Same. Rents and improvements.* When, therefore, the defendant in good faith, under an honest belief of title, mined coal on land only valuable for the coal, and cut timber for the purpose of erecting houses on the land and making props for the mine, he was held liable for the value of the coal *in situ,* and for the timber as trees, and for the rent of the houses erected, but allowed the permanent enhancement of the land by reason of the improvements.

5. SAME. *Forged deed.* The fact that there is a forged paper as a link in the defendant's title, containing on its face marks of suspicion, is a circumstance to be looked to in determining the question of good faith, but not conclusive upon him as matter of law.

FROM MORGAN.

Appeal from the Chancery Court at Wartburg. D. K. YOUNG, J.

A. S. PROSSER for complainant.

LUCKEY & YOE, WEBB & McCLUNG and SEVIER & WALKER for defendants.

COOPER, J., delivered the opinion of the court.

On May 10, 1882, the defendant, Russell, claiming the land in controversy under a written instrument of sale purporting to have been executed by Patsey J. Galbraith, on March 2, 1871, undertook to sell the land to the defendant, Scott, by assigning to him the instrument of sale, and making him a deed to the land. The defendant, Scott, caused the assignment, with the instrument attached, and the deed to be duly registered about a month after he received them. On

August 4, 1882, the bill in this cause was filed by the complainant as the rightful owner of the land, under conveyances which are set out, alleging that the supposed contract of sale, purporting to be executed by Patsey J. Galbraith, was a forged instrument, containing on its face sufficient evidence to a man of ordinary business capacity that it was not genuine, averring that the defendant, Scott, under this forged title, was cutting timber and mining coal on the land, and asking that he be enjoined from thus committing waste. The bill prayed that it be decreed that the complainant's title to the land was valid and perfect; that defendant, Scott's, title be declared void, and a cloud upon complainant's title ; that complainant have a writ of possession for any part of the land in possession of the defendants, or any person under them, and that the necessary orders be made for the stating of an account, showing the value of the timber cut and coal mined, and that a decree be rendered for the same.

The defendant, Scott, answered the bill, insisting upon the genuineness of the instrument sought to be impeached, but denying, in the event the fact should be otherwise, all charges of collusion with his co-defendant, and claiming that he bought the land in good faith, and paid the price, under the belief that he was acquiring a good title. The depositions of Russell and of several of his relations and neighbors, were taken to establish the genuineness of the instrument under which he claimed title, and that he had been in possession of the land for more than seven

years. But the entire proof clearly showed that the instrument was a forgery. The defendant, Scott, was not implicated in the wrong, and he himself testifies that he bought the land in good faith, without any knowledge of the forgery at the time, or at any time, until alleged in the bill and proved. He ceased to contest the complainant's title as soon as the testimony of Russell and his friends satisfied him that the proof of forgery could not be successfully met. On July 4, 1883, a decree was rendered, virtually conceded to have been by consent, declaring that the complainant's title to the land in controversy was superior to that of the defendant, Scott, that the claim of the latter rests as a cloud upon that title, and settling the rights of the parties accordingly. The cause is then referred to the master to hear proof and state an account, and report certain facts upon which a final decree may be rendered, reserving all questions on the basis of the account and measure of relief. Previously, after the coming in of the answer, the chancellor had, on September 5, 1882, dissolved the injunction granted when the bill was filed, upon the defendant, Scott, entering into bond with good security in the penal sum of $5,000, conditioned to indemnify and save harmless the complainant from any loss or damage that might accrue, or be decreed to him by reason of the dissolution, and of the defendant mining coal and cutting timber upon the land described in the bill. The decree of July 4, 1883, contained the following provision, which, it is clear, could only have been made with the consent

of the complainant: " In the meantime the defendant, Scott, is not prohibited from mining and removing coal from said land as heretofore, the same to be accounted for under and upon the basis and settlement of this account, and his bond filed upon dissolution of the injunction."

The chancellor, upon the coming in of the master's report, held that the proper basis of the account for mining was the value of the coal in bed, unmined and existing as realty, and that this value, under the proof, was the usual royalty paid by lessees for the right of mining, which he found to be one cent for each bushel of coal mined. He also held that the defendant, Scott, was not entitled to any thing for betterments put on the land, nor the complainant to damages for the timber cut, because the same was used in building houses on the land and as props in mining. The exceptions filed by both parties to the master's report were disallowed, and a decree was rendered against Scott for the amount of royalty found, with interest, and the costs of the cause, including the costs of surveys made by the complainant. From so much of this decree as fixed the basis of damages to be allowed him for coal mined and timber cut, the complainant alone appealed.

The Referees are of opinion that the defendant, Scott, is to be regarded as a wilful trespasser, or, at least, as one who has negligently failed to investigate his title, the foundation of which as to him is a paper bearing upon its face such marks of forgery as to put a prudent man upon inquiry, and when nearly

all of the coal was mined and timber cut after the bill was filed charging a forgery. They hold that, under the circumstances, the defendant should be charged with the value of the coal at the mouth of the mine, or what it was sold for at that place, without any deduction for the cost of digging it out, or for other expenses incurred in mining or transporting the coal to the mouth of the mine. Even if the defendant could be regarded as having converted the coal under a *bona fide* belief of right, the Referees report that he should be charged with the value of the coal at the mouth of the mine, or what it brought at that point, and should be only allowed the cost of transporting it to that point, without any deduction for severing it from the land. To charge him with "royalty" only is, in their view, to allow him the profit in the business, or to place him, although a wrong-doer, on the same footing as one who mines under contract with the owner. For the same reason they charge the defendant with the highest value shown by the proof of the timber cut from the land, namely the value of the lumber and props into which the timber was converted. They concur with the chancellor in holding that defendant was entitled to nothing for betterments, but, curiously enough, say that he should be charged with rents received by defendant from the lease of the houses erected by him with a part of the timber cut. The defendant, Scott, excepts.

The chancellor merely found that the complainant had the better title. The Referees do not say that

the defendant was a wilful wrong-doer, or that he was implicated in the matter of the forgery. Their idea is that he is a wilful trespasser because he negligently failed to investigate his title, one link of which was a paper bearing upon its face such marks of forgery as to put a prudent man upon enquiry, and because most of the mining was done after the bill was filed. The original instrument in question has been sent up with the record. When looked at now, or at the time the Referees had it before them, in the light of the proof of its forgery, it might well look suspicious, not because the dates and signatures are written in different ink from that used in the body of the instrument, for that might happen in any case where the instrument was drafted at one place and signed at another, but because there is a very rough erasure, so rough as to have made a hole in the paper, of the figures constituting the date of the year as first written, and because there is a striking resemblance in the handwriting of the signatures of the bargainor and the attesting witnesses. That these *indicia* exist is a circumstance, and a strong circumstance, to be looked to in determining the question of the defendant's good faith. But the existence of the *indicia* is not conclusive. The question is not one of negligence or oversight, but of good faith. The proof is that the forged instrument bore the ostensible date of March 2, 1871, a date more than ten years preceding the sale to Scott, that Russell claimed that he had been in actual possession of the land for a sufficient length of time to perfect his title by the

statute of limitations, and that he himself positively swore to the fact and the genuineness of the paper in a deposition taken in this cause, and produced several witnesses who undertook to sustain him upon the point of possession. The record shows further, that defendant had the assignment to him of the supposed contract, with the instrument itself, and his deed duly and promptly registered; that he paid the purchase price of the land, and expended about five thousand dollars in opening the mines, and making the necessary improvements to work them; and that he has worked the mines as the owner of the land. He swears, as we have seen, that he had nothing to do with the forgery, nor any knowledge of it until alleged in the bill. He ceased to litigate as soon as the forgery was clearly proved, and a decree, which is conceded to have been by consent, was at once entered in favor of the complainant, declaring the superiority of his title and ordering an account. We think, with the chancellor, that the defendant must be treated as having entered upon the land in good faith, and exercised acts of ownership under an honest claim of right. He continued to work the mine after the bill was filed upon the same claim of right until the forgery was established, and afterwards under the consent decree. His liability throughout must be considered as resting upon substantially the same basis.

The courts of law, trammeled by their forms of action and the principles upon which they were supposed to rest, such as title in replevin and conversion in trover, have found it very difficult to formulate a

Ross *v.* Scott and Russell.

rule which would lead to uniformity in the recovery of damages for the same wrong. The result depended upon the form of action adopted and the time of bringing suit, and might be very different, although the real cause of injury was the same. We find a strong example in the case of the *Woodenware Company* v. *United States,* 106 U. S., 432. There a trespasser cut timber from the public lands to the value of sixty dollars, which would have been the limit of the recovery in trover against the wrong-doer at the place. But he carried the timber to a distant market at a heavy expense, and sold it to an innocent purchaser for $850. In an action brought by the United States against the purchaser, in the nature of an action of trover, it was held by the Supreme Court that the recovery should be the value of the timber at the time of sale. The result may be logical, but the inequality between the damages and the recovery is too great to be satisfactory. And neither the English nor the State authorities have gone quite so far. The tendency of the courts, the text-writers all agree, is to look less to form and more to the substantial object of all rights of action, which is to redress the injury by just compensation: 3 Suth. on Dam., 376, 488; 2 Sedg. on Dam., 484; Add. on Torts, sec. 539; 7 Cent. L. J., 301. "A careful examination of the authorities," says the Supreme Court of Nevada, in a recent case, " has convinced us that there is a growing inclination among all courts, where it can be done, to apply the only safe and just rule in actions of damages, whether *ex contractu* or *ex*

*delicto*, and that is to give the injured party as near compensation as the imperfection of human tribunals will permit": *Waters* v. *Stevenson*, 13 Nev., 157. "In civil actions," says the Supreme Court of Michigan, during the present year, "the amount of recovery does not depend upon the form of the action in a case like the present (where logs were cut by mistake from the lands of another and hauled into a creek several miles from the land), but, whether it be upon contract or in tort, the proper measure of damages, except in cases where punitory damages are allowed, is just indemnity to the party injured for the loss, which is the natural, reasonable and proximate cause or result of the wrongful act complained of": *Ayres* v. *Hubbard*, 32 Alb. L. J., 217. And such was the rule of damages applied by this court in *Ensley* v. *Mayor, etc., of Nashville*, 2 Baxt., 144, where timber was cut by a wilful trespasser. The measure of damages was held to be the value of the trees as they stood upon the land, and the injury to the land by their removal. The weight of authority, both of English and American, now is, that where there is an honest dispute as to title, or where the trespass has been from ignorance and not wilful, the damages will be confined to the value of the property before the trespass was committed, or, to use the language of the English courts, "at the same rate as if the property taken had been purchased *in situ* by the defendant at the fair market value of the district": *Wood* v. *Morewood*, 3 Q. B., 440; *Jegon* v. *Vivian*, L. R., 6 Ch., 742; *Hilton* v. *Woods*, L. R., 4 Eq.,

432; *In re United Merthyr Collieries Company*, L. R., 15 Eq., 46; *Livingston* v. *Raward's Coal Company*, 42 L. T., (N. S.), 334; *Goller* v. *Felt*, 30 Cal., 481; *Forsyth* v. *Wells.* 41 Pa. St., 291; *Ward* v. *Carson River Wood Company*, 13 Nev., 44; *Weymouth* v. *Northwestern Railroad Company*, 17 Wis., 550; *Foote* v. *Merrill*, 54 N. H., 490. *Longfellow* v. *Quimby*, 33 Me., 457; *Stockbridge Iron Company* v. *Cove Iron Works*, 102 Mass., 80; *Railway Company* v. *Hutchins*, 32 Ohio St., 571.

The court of chancery is not hampered by forms, and possesses all the power and means to do exact justice as near as is possible. It never enforces forfeitures nor gives punitive damages. The fundamental rule of equity is to afford just compensation to its suitors. The bill before us is, under our decisions, one of pure equitable cognizance: *Almony* v. *Hicks*, 3 Head, 39. It seeks to remove the defendant's paper title as a cloud upon the complainant's legal title to the land in controversy, and, as the necessary consequences of the decree, to recover possession of the land in controversy, and to have an account for mesne profits and waste. All that the complainant can claim on the account is just compensation for the coal mined and wood cut. That just compensation, under the foregoing principles of law and the rules of a court of equity, is the value of the coal before it was mined, and of the wood before it was cut, with such damages, if any, as may be occasioned by the impairment of the value of the land by reason of the removal, or mode of removal, from the soil.

The proof does not show, nor do we understand it to be seriously claimed, that the value of the land has been impaired by the removal, either of the coal or wood. The only claim and contest are over the value of the coal and timber. The chancellor allowed the highest royalty which the owner of the land could obtain for the privilege of taking out the coal. That royalty is the price of the coal *in situ* before it is severed. It is no objection to this rule that the defendant is allowed the profit of mining. For, obviously, there could be no sale of coal *in situ* if there were no profit in mining it. And even in the case of a wilful trespasser on land, all that the real owner can recover in the way of mesne profits is reasonable rent, not a rack-rent, but a rent which leaves a margin for profit. And the reason is that otherwise there could be no renting at all. The chancellor's decree as to the value of the coal with which the defendant should be charged was therefore correct.

In the absence of special damage to the land, which is not shown or claimed, the complainant would be entitled to the value of the timber cut as it stood in the tree, and to the rent of the houses erected on the land with that timber. On the other hand, the defendant would be entitled to the permanent enhancement of the value of the land by reason of the permanent improvements made by him as they existed at the time of the consent decree (when the defendant began to mine virtually under contract), to the extent at least of the rent and waste. The master reported the value of the trees cut at $120, and the value of

the defendant's improvements at $1,250, of which $1,100 were spent in erecting houses. The Referees. find .that the latter expenditure was made in erecting eleven houses, seven of which, made of logs, were upon complainant's lands. The value of the trees as above being $120, the Referees find the value of small timber used as props to be $131.25, and the amount of rent $168, these three sums amounting to $419.25. The most moderate estimate of the enhancement of the value of the land by the improvements of the defendant would certainly exceed this sum. And, besides, the small timber used as props in the mine were no doubt paid for by the increased royalty on the additional coal gotten out by their use, and the charge of rent has been carried beyond the date of the agreed decree.

The report of the Referees will be set aside, and the decree of the chancellor affirmed. The complainant will pay the costs of this court.